IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 14-cr-429-5 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| JOHN L. O'LEARY, IV, a/k/a "J.B." ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant John O'Leary, IV was charged with seven counts in connection with a drug distribution conspiracy on the south side of Chicago, Illinois. [220 (Counts 1, 22, 27, 29, 36, 43, 44).] The Government dismissed Count 36, and the parties stipulated to conduct supporting Defendant's convictions for nearly all of the remaining counts. Defendant voluntarily waived his right to a jury trial and elected to proceed with a bench trial on the sole issue of whether the Government could prove the drug quantity charged in the conspiracy count (Count 1) beyond a reasonable doubt. A bench trial was held on January 30, 2017 [629], and both parties filed post-trial briefs [713; 714; 716; 717].

After carefully considering all of the parties' submissions, their stipulations, and the evidence adduced at trial, the Court sets forth below its findings of fact and conclusions of law pursuant to Federal Rule Criminal Procedure 23(c). To the extent that findings of fact, as stated, may be considered conclusions of law, they should be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they should be deemed findings of fact. In the end, the Court concludes that the Government established beyond a reasonable doubt that Defendant conspired to possess with intent to distribute and distributed 280 grams or more of a mixture and substance containing a detectable amount of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1). The Court

also concludes that the Government established beyond a reasonable doubt each of the four crack cocaine distribution charges in violation of 21 U.S.C. §§ 841(a)(1) and (2), which occurred on April 9, 2014 (Count 22), April 25, 2014 (Count 27), July 6, 2014 (Count 43), and July 9, 2014 (Count 44). In addition, the Court concludes that the Government established beyond a reasonable doubt that Defendant had a prior felony conviction and knowingly possessed a firearm that had traveled in interstate commerce in violation of 18 U.S.C. § 922(g)(1) (Count 29). Accordingly, the Court finds Defendant guilty of all six charges in the Indictment [220]. This matter is set for status hearing on August 23, 2017, at 9:00 a.m.

## I. Findings of Fact

In late 2010, Defendant John O'Leary, IV joined a drug conspiracy led by members of the Gangster Disciples. [Tr. Jan. 30, 2017, at 26.][1] The group operated from a "main spot" near West Jackson Boulevard and South Kilbourn Avenue, which is close to Garfield Park in Chicago, Illinois. *Id.* Co-Defendant Christopher Harris—the "Boss"—was the "day-to-day leader" and supplier for the "spot." *Id.* at 27, 28. Harris oversaw "managers" or "runners" like co-Defendants Antwaion Edwards ("Fee"), Johnathan Green ("Whiteboy"), and Fabian Redmond ("Mook"), who were responsible for distributing packages of crack cocaine or "packs" directly to "pack workers" like Defendant. *Id.* at 26–27. The runners were also responsible for deciding how many packs to give each worker. *Id.* According to Defendant, Edwards liked him and would give him "four packs at a time," while he gave others only one pack at a time. *Id.* at 27. Defendant testified that the same dynamic was present with other runners and their favorite pack workers, including Green and co-Defendant pack worker DeShawn Richardson ("Little Lord"). *Id.*

---

[1] The evidence presented at the bench trial included Defendant's prior grand jury testimony, Defendant's brief live testimony, the parties' stipulations [630], a map, six wiretapped telephone calls, a firearm, and roughly 23 grams of crack cocaine that had been seized in the course of the conspiracy.

Each pack contained 30 rocks of cocaine (roughly 3 grams total), and each packer worker would then sell the drugs to customers at $10 per rock. [Tr. Jan. 30, 2017, at 26.] When the entire pack was sold, each pack worker would give the runner $200 and keep $100. *Id.* at 27. The amount sold by group appears to have fluctuated over time. From late 2010 through 2012, "each pack worker sold about eight packs per day" to "hundreds" of customers. *Id.* Volume decreased in 2013 to about "four packs per day per worker," but jumped back up to eight packs per worker per day in 2014. *Id.* The busiest times of the year were the first of the month and tax refund season. *Id.* at 28. During those times, all of the workers might receive a total of 67 packs a day. *Id.* In less busy times, workers might only receive 37 packs a day. *Id.* "On average, the spot operated seven days a week and workers worked from about 7:00 a.m. until about 10:00 p.m." *Id.* at 27. "On average, there were five workers working at time," and workers included co-Defendants Richardson, Patricia Neal, Cauriece Herndon, and Andrew Jones.[2] *Id.*

Before the grand jury, Defendant expressed a clear understanding of how the conspiracy operated and his role in it. For example, he testified that he observed Harris distribute packs to runners Edwards, Redmond, and Green "several times." *Id.* at 28. He characterized these distributions as Harris handing out the "day's work." *Id.* He also testified that runners had a different "status" than workers because they would receive an extra pack and could keep all of the proceeds from this extra pack for themselves. *Id.* at 28. Defendant further explained that "[a]s a pack worker, [he] was responsible for selling crack cocaine to customers, collecting customer's money, and looking out for police." *Id.* at 26.

Six recordings of wire tapped telephone calls between March 30, 2014, and April 29, 2014, that were introduced into evidence add further color to the conspiracy. In one call, Defendant and Green discussed whether another pack worker, "Ant," had sold drugs at their spot

---

[2] This Court has already sentenced many of Defendant's co-Defendants, most of whom pled guilty.

3

that were not supplied by Harris. Defendant stated, "Man, I hope this n*gger ain't go buy no cocaine and try to sell his own sh*t to make some extra money." [Gov. Ex. 3 (Call No. 49431).] Green responded, "Boy, I'll knock that ass out." *Id.* Two other calls show Defendant watching out for police activity, such as when Defendant warned Green that police were nearby and that someone might alert the police to the "trap [stash] house." *Id.* (Call Nos. 41722 & 50610). Another call shows Defendant referring to "a whole 30," meaning a complete pack with 30 rocks of crack cocaine. *Id.* (Call No. 39727). At least three calls discuss the number of packs that had been sold that day, including how many rocks were left in the pack. See *id.* (Call No. 41722 (Green: "You on your third one yet?"; Defendant "Yeah I got six left.")); *id.* (Call No. 52424 ("I got 13 on my second one."); *id.* (Call No. 55767 (Defendant was "working on [his] fourth")).

The parties also stipulated to several specific incidents involving Defendant and his co-Defendants. These include the following:

1. "On April 9, 2014, an undercover police officer conducted a controlled buy of crack cocaine from [Defendant]. Specifically, the officer travelled in an undercover vehicle to the area of Jackson and Kilbourn in Chicago. The officer approached [Defendant] and asked, 'You up?' [Defendant] understood the officer to be asking if he had crack cocaine. [Defendant] responded, 'Yeah, haul out.' The officer then parked the undercover vehicle and exited it. The undercover officer approached the fence at 316 South Kilbourn after exciting the residence. [Defendant] asked the officer, 'How many?' The officer responded, 'Five.' [Defendant] then reached into his mouth and retrieved five clear Ziploc bags with green tint, each containing what appeared to be crack cocaine. [Defendant] handed the five bags to the undercover officer, who handed [Defendant] $50 in prerecorded cash. [630, ¶ 5 (Stipulation 5).]

2. "On or about April 25, 2014, an undercover police officer drove to 316 South Kilbourn in an undercover vehicle and parked. The undercover office spoke briefly with [Defendant]. During the conversation, the undercover officer asked [Defendant], 'Are you up?' [Defendant] directed the officer to the alley behind 316 South Kilbourn. [Defendant] told the officer to locate 'A tall skinny dude' named 'Chyree.' The undercover officer asked for six bags of crack cocaine for $50 dollars. [Defendant] agreed. The undercover officer entered the alley. [Defendant] directed him to keep walking west in the alley. The officer saw an unknown male exit the rear of 4523 West Jackson. The

4

officer walked toward this area and saw two men sitting on the back porch behind 4523 West Jackson. The officer asked for 'Chyree,' and [a] black male wearing a black sweatshirt and dark pants tendered the officer 6 small, clear, blue-tinted Ziploc bags, each containing crack cocaine, in exchange for $50. 'Chyree' was Cauirece Herndon." *Id.* ¶ 7 (Stipulation 7).

3. "On the morning of April 26, 2014, Fabian Redmond met with Chris Harris for the purpose of receiving a new supply of crack cocaine. After the meeting, law enforcement attempted to arrest Redmond. Redmond fled in a van, but was eventually arrested. During the chase, Redmond threw the crack cocaine he had received from Harris out of the window. Following his arrest, Redmond offered to get a gun for officers if they would release him. Redmond, while in custody, contacted Chris Harris, informed Harris of his arrest, and asked Harris to get a gun for him. Harris and Johnathan Green made arrangements to retrieve a firearm. In a later call, Redmond instructed Green to put the gun on Wilcox Avenue at the end of the train tracks. Later that day, Green gave [Defendant] a firearm in a white plastic bag. [Defendant], at the direction of Green, later tossed the bag containing the gun near the train tracks at approximately 4552 West Wilcox Street, Chicago, Illinois. Government Exhibit 29-A is the firearm O'Leary tossed to secure Redmond's release that day." *Id.* ¶ 9 (Stipulation 9).[3] In connection with this incident, the parties also stipulated that (1) "Government Exhibit 29-A, a Ruger .22 caliber Model MK-II semi-automatic pistol, bearing serial number 222-52408, is an operational firearm that traveled in interstate commerce prior to April 26, 2014," *id.* ¶ 10 (Stipulation 10); and (2) Defendant has been convicted of at least one felony punishable by a prison term of more than one year, *id.* ¶ 11 (Stipulation 11).

4. "On May 15, 2014, Fabian Redmond was arrested by law enforcement in possession of six large plastic baggies, each of which contained thirty small plastic bags, which each contained one rock of crack cocaine. Government Exhibit 36-A contains 180 small plastic bags containing a total of 21.9 grams of crack cocaine." *Id.* ¶¶ 12–13 (Stipulations 12 and 13).

5. "On July 6, 2014, Johnathan Green met with Chris Harris to retrieve a new supply of crack cocaine. Following the meeting, Green drove to the 300 block of South Kilbourn in Chicago. Green then exited his vehicle and entered 312 S Kilbourn with [Defendant] and DeShawn Richardson. All three exited a short time later, at which time crack cocaine customers approached the area. One of those customers was stopped by law enforcement shortly after she purchased one .1 gram quantity of crack cocaine from DeShawn Richardson. The customer threw the crack cocaine to the ground as law enforcement approached her. The customer was not arrested. Government Exhibit 43-A is

---

[3] The Government also highlighted Defendant's grand jury testimony about this incident during the bench trial. [See Tr. Jan. 30, 2017, at 28 (describing how he, Green, and others "laid down a gun to get [Redmond] out of jail" after Redmond was arrested by police in summer of 2014).

  the crack cocaine the customer threw to the ground. Later that day, the customer reported the stop to Green, who in turn reported the stop to Harris." *Id.* ¶ 14 (Stipulation 14).

6. "On July 9, 2014, law enforcement observed Antwaion Edwards engage in a hand-to-hand transaction with the passenger of a maroon Chevy minivan in the south alley behind 4523 W. Jackson Boulevard in Chicago. Law enforcement stopped the minivan a short distance away. As law enforcement approached the minivan, the passenger exited the vehicle and dropped a clear ziplock baggie containing crack cocaine. Government Exhibit 44-A is the crack cocaine the customer dropped to the ground. Later that day, law enforcement approached Edwards for a field interview. [Defendant] stepped in front of the officers' vehicle, blocking their path, as they were approaching Edwards, who fled inside the basement apartment located at 4523 West Jackson. Edwards was detained inside the apartment as he exited the front bathroom having just flushed the toilet. Later that day, Green reported the incident to Harris by telephone." *Id.* ¶ 16 (Stipulation 16).

On November 6, 2014, Defendant was indicted and charged with conspiracy to possess with intent to distribute and distribution of 280 grams or more of a mixture and substance containing a detectable amount of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); distribution of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (2) on April 9, 2014 (Count 22), April 25, 2014 (Count 27), July 6, 2014 (Count 43), and July 9, 2014 (Count 44); and being in a felon in possession of a firearm violation of 18 U.S.C. § 922(g)(1) on April 26, 2014 (Count 29) and May 15, 2014 (Count 36). A bench trial was held on January 30, 2017, at which point the Government dismissed one of the felon in possession counts, Count 36. [Tr. Jan. 30, 2017, at 8.]

## II.  Analysis & Conclusions of Law

###  A.  Undisputed Counts (Counts 22, 27, 29, and 43)

Defendant does not present a defense regarding three of the distribution charges (Counts 22, 27, and 43) and the only remaining felon in possession of a firearm charge (Count 29). To prove distribution, the Government must prove that Defendant (1) knowingly distributed crack cocaine, and (2) knew that the substance was some kind of controlled substance. Pattern

Criminal Jury Instructions of the Seventh Circuit for 21 U.S.C. § 841(a)(1) at 639 (2012); *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). To prove unlawful possession of a firearm by a felon, the Government must prove that (1) Defendant knowingly possessed a firearm, (2) he was a felon at time of the possession, and (3) the firearm had been shipped or transported in interstate commerce. 7th Cir. Pattern Instruction for 18 U.S.C. § 922(g); *United States v. Johnson*, 127 F.3d 625, 629 (7th Cir. 1997). In light of the parties' stipulations, the facts found above, and this law, the Court agrees that the Government has satisfied its burden to prove Counts 22, 27, 29, and 43 beyond a reasonable doubt.

Regarding Count 22, Defendant stipulated that he knowingly sold 0.4 grams of crack cocaine to an undercover officer on April 9, 2014. [630, ¶¶ 5, 6.] Defendant stipulated that he understood that the officer asked him if he had crack cocaine. *Id.* Defendant responded, "Yeah" and "How many?" and the officer said, "five." *Id.* Defendant then gave the officer five green-tinted Ziploc bags of crack cocaine and the officer handed him $50. *Id.* These stipulated facts prove Defendant guilty beyond a reasonable doubt of Count 22 because he knowingly and intentionally distributed a mixture and substance containing a detectable amount of cocaine base on April 9, 2014, in violation of 21 U.S.C. §§ 841(a)(1) and (2).

For Count 27, Defendant stipulated that he and Herndon knowingly sold 0.4 grams of crack cocaine to an undercover officer on April 25, 2014. [630, ¶¶ 7, 8.] As with Count 22, Defendant stipulated that the undercover asked him, "Are you up?" *Id.* Defendant then directed the officer to an ally behind 316 Kilbourn Avenue, told him to locate "Chyree," and agreed to the sale of six bags of crack cocaine for $50. *Id.* The officer entered the alley, asked for Chyree, and Herndon gave him six small blue-tinted Ziploc bags "each containing crack cocaine" in exchange for $50. *Id.* These stipulated facts prove Defendant guilty beyond a reasonable doubt

of Count 27 because he knowingly and intentionally distributed a mixture and substance containing a detectable amount of cocaine base with co-Defendant Herndon on April 25, 2014, in violation of 21 U.S.C. §0§ 841(a)(1) and (2).

With respect to Count 43, Defendant stipulated that Defendant, Green, and Richardson entered a home on South Kilbourn Avenue on July 6, 2014, shortly after Green met with Harris "to retrieve a new supply of crack cocaine." [630, ¶¶ 14, 15.] The three exited as "crack cocaine customers approached," and one of those "customers" was stopped by law enforcement after purchasing 0.1 grams from Richardson. *Id.* Under the principles established in *Pinkerton v. United States*, 328 U.S. 640 (1946), "[a] conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offenses were committed and if the offenses were committed in furtherance of and as a foreseeable consequence of the conspiracy." *United States v. Wantuch*, 525 F.3d 505, 518 (7th Cir. 2008). Defendant concedes that he "stipulated to the facts necessary to establish the existence of a conspiracy and his involvement in it." [713, at 5.] Defendant's grand jury testimony shows that he knew that Harris, Green, and Richardson were all members of the conspiracy. Harris (the "Boss") supplied Green (a "runner"), who then distributed packs to Defendant and Richardson (two "pack workers"). On July 6, 2014, Green, Richardson, and Defendant jointly entered a resident after Green had been resupplied and then jointly exited to sell crack cocaine to "customers." Richardson sold their jointly acquired crack cocaine to one of those customers—a crime that was reasonably foreseeable to Defendant, in furtherance of the goals of the conspiracy, and while Defendant was a member of the conspiracy. These facts prove Defendant guilty beyond a reasonable doubt of Count 43 because he knowingly and intentionally distributed a mixture and

substance containing a detectable amount of cocaine base with co-Defendants Richardson, Green, and Harris on July 6, 2014, in violation of 21 U.S.C. §§ 841(a)(1) and (2).

Concerning Count 29, Defendant stipulated that he had been convicted of a felony before April 26, 2014, that was punishable by imprisonment term of one year; he possessed a Ruger .22 caliber Model MK-II semi-automatic pistol with the serial number 222-52408 on April 26, and this firearm is an "operational firearm that traveled in interstate commerce prior to April 26, 2014." [630, ¶¶ 9–11.] These stipulated facts prove Defendant guilty beyond a reasonable doubt of Count 29 because he knowingly possessed a firearm on April 26, 2014, and had previously been convicted of a felony punishable by more than one year imprisonment in violation of 18 U.S.C. § 922(g)(1).

### B. Disputed Distribution Count (Count 44)

In light of the facts found, the parties stipulations, and law outlined above, the Court also concludes that Defendant is guilty of distributing crack cocaine on July 9, 2014 (Count 44). Defendant stipulated that Edwards sold crack cocaine to a customer on July 9 from "the south alley behind 4523 W. Jackson Boulevard." [630, ¶ 16.] When law enforcement attempted to approach Edwards for a field interview later that day, Defendant "stepped in front of the officers' vehicle, blocking their path, as they were approaching Edwards, who fled inside the basement apartment located at 4523 West Jackson." *Id.* Defendant stipulated that Edwards was detained by police after he exited the bathroom "having just flushed the toilet," and Green reported this incident to Harris later that day. *Id.*

Defendant originally maintained that he would not present any defense on this count. [Tr. Jan. 30, 2017, at 49 ("I will say that we'll submit those [counts other than Count 1) to your Honor based on the stipulated conduct and not present any arguments.").] After reviewing the

transcript from the bench trial, Defendant now argues that the Government failed to meet its burden on Count 44. [713, at 10–11.] Specifically, Defendant contends that the Government did not introduce any specific evidence of this transaction, Defendant did not mention the sale in his Grand Jury testimony, and it is "undisputed" that Defendant "was not involved in the actual distribution of crack cocaine" to the customer earlier in the day on July 9. *Id.* at 10. Although Defendant states that "the stipulated facts are sufficient to tie the July 9, 2014, transaction to the conspiracy," he still contends that there is "no evidence that [Defendant] was present for the transaction or he had any knowledge it was taking place." *Id.* at 10–11. Defendant argues that, at best, he was an accessory after the fact and cannot be guilty under an aiding and abetting theory. *Id.* at 11. The Government points out in its response that, like Count 43, it relies on *Pinkerton* liability for Count 44. [714, at 9–12.] As a result, Defendant shifts course in his reply, arguing that "there is no evidence that [he and Edwards] were co-conspirators," he "does not mention Mr. Edwards" in his Grand Jury testimony, there is "no evidence" they "work[ed] in concert," and thus there is "no evidence" that they conspired with one another. [717, at 6.]

The Court is not persuaded. "[A] defendant may be found guilty of a substantive offense committed by a co-conspirator if the offense was committed in furtherance of the conspiracy at the time the defendant was a member of the conspiracy, even if the defendant neither participated in nor had knowledge of the substantive offense." *United States v. Pisman*, 443 F.3d 912, 913 (7th Cir. 2006). Likewise, "[a] person who aids or abets the commission of a crime is liable as a principal." *United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014).

Here, Defendant concedes that these "stipulated facts are sufficient to tie the July 9, 2014, transaction to the conspiracy." [713, at 11.] Moreover, Defendant overlooks that he *did* testify that he and Edwards were part of the same conspiracy. He said that Edwards gave him more

10

packs than other pack workers. [Tr. Jan. 30, 2017, at 27 ("Fee liked me, so he gave me four packs at a time, when he would only give other people one.").] He admitted to being present when Harris distributed drugs to Edwards. *Id.* at 28 ("I have been with * * * Fee * * * several times in a car when Harris gave them the day's work."); see also [Gov. Ex. 5, at 4 ("[Harris] would call whatever runner was on that day * * * [such as] Fee, and tell them how many packs to hand out to [another pack worker].")]. Defendant also stipulated that he helped sell drugs out of the same residence—4523 West Jackson Boulevard—involved in the July 9 incident. [See 630, ¶ 7 (directing an undercover officer to purchase drugs from a co-Defendant sitting on the porch behind this address just over one month earlier).] He even acknowledged that drugs were sold from around this location to "hundreds" of customers. [Tr. Jan. 30, 2017, at 27.] Furthermore, Defendant stipulated that Green reported the July 9 incident to Harris, suggesting that this conduct was directly relevant to the conspiracy and needed to be reported to the "Boss." There is no dispute from the wire taps [Gov. Ex. 3 (Call Nos. 39727, 41722, 49431, & 50610)] and other stipulations [630, ¶¶ 9, 14] that Defendant worked with Green in the conspiracy.

In addition, Defendant's conduct on July 9 is entirely consistent with his role in the conspiracy. Defendant described one of his roles as looking out for police. [Tr. Jan. 30, 2017, at 26.] Recorded phone calls capture him reporting police activity to Green. [See Gov. Ex. 3 (Call No. 49431).] He also told the grand jury that he provided "security" for the conspiracy. [Gov. Ex. 5, at 3.] In this context, Stipulation 16 shows Defendant carrying out his police interference role by blocking police from questioning Edwards—stalling them so that Edwards could flush any remaining drugs down the toilet. Efforts to enable his co-conspirator to avoid police detection or accountability undoubtedly furthered their collective drug distribution enterprise.

Again, Defendant acknowledges that he "stipulated to the facts necessary to establish the existence of a conspiracy and his involvement in it," and the July 9 transaction is "tie[d]" to the conspiracy. [713, at 5, 11.] Taken together, the evidence in the record shows that Edward's distribution of cocaine on July 9 was reasonably foreseeable to Defendant, in furtherance of the goals of the conspiracy, and while Defendant was a member of the conspiracy. Accordingly, these facts prove Defendant guilty beyond a reasonable doubt of Count 44 because he knowingly and intentionally distributed a mixture and substance containing a detectable amount of cocaine base with co-Defendants Harris, Green, and Edwards on July 9, 2014, in violation of 21 U.S.C. §§ 841(a)(1) and (2).

### C. Disputed Conspiracy Count (Count 1)

Because Defendant concedes that the Government can prove "a conspiracy existed and that he was a part of it" [713, at 2], the main disputed issue for Count 1 is whether the Government has proven the relevant quantity—280 grams of crack cocaine—beyond a reasonable doubt.

The Government's calculation method is straightforward. Defendant testified that he was a member of the conspiracy from 2010 to 2014, an average of five pack workers worked at a time, each worker sold four packs on average, and each pack contained 3 grams of crack cocaine. [Tr. Jan. 30, 2017, at 26–27.] Said differently, the conspiracy sold at least 60 grams of crack cocaine per day, which means it sold 280 grams in about 5 days. Yet the conspiracy operated seven days per week for almost four *years* or roughly 1,300 days. Based on these estimates from Defendant's testimony, the Government contends that the 280-gram threshold is easily satisfied.

Defendant does not dispute that his grand jury testimony, if credited, shows that the conspiracy sold more than 280 grams of crack cocaine during its operation. Rather, he asserts

12

that Government cannot rely on his statement without sufficient corroborating evidence for each aspect of its calculation (*i.e.*, number of workers per day, packs sold per day, etc.). *Id.* at 5–10. Defendant contends that several of these inputs lack sufficient corroboration, which means the Government cannot satisfy its burden.

"It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89 (1963). When a conviction or proof of an element of conviction is based "solely" on such a statement, there must be "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper v. United States*, 348 U.S. 84, 92 (1954); *United States v. Grizales*, 859 F.2d 442, 445 (7th Cir. 1988). The "corroboration requirement does not mean that the evidence other than the [Defendant's] statement must independently establish" a specific element of the charge. *Grizales*, 859 F.2d at 445. Instead, the "purpose" of the corroboration requirement is "to ensure the reliability of the" statement. *Id.* (citation and internal quotation marks omitted). This reliability function is satisfied "if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper*, 348 U.S. at 93.

The underlying premise of Defendant's argument is that each input of the Government's quantity calculation drawn from Defendant's testimony is an "essential fact" that must be independently corroborated. That is not the law. "Corroborating evidence is required in cases of party admissions not to establish the admission itself, but rather to ensure its reliability." *United States v. Curtis*, 324 F.3d 501, 507 (7th Cir. 2003). For that reason, corroboration is typically "accomplished by presenting evidence that a *few of its key assertions* are true, which is sufficient to show that the statement as a whole is trustworthy." *United States v. Dalhouse*, 534 F.3d 803,

13

806 (7th Cir. 2008) (emphasis added). "In other words, all that is necessary is for the government to present extrinsic evidence tending to corroborate the confession, [and then] the confession as a whole is admissible, and some elements of the offense may be proven entirely on the basis of [the] corroborated confession." *United States v. Fujii*, 301 F.3d 535, 541 (7th Cir. 2002) (citation and internal quotation marks omitted); accord *Smith v. United States*, 348 U.S. 147, 156 (1954) ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.").

In fact, the Seventh Circuit rejected Defendant's very argument in *United States v. Brooks*, 513 F. App'x 612 (7th Cir. 2013). In *Brooks*, the defendant was convicted of possessing a handgun in furtherance of a drug-trafficking offense based in large part on his confession that he traded marijuana for the firearm. *Id.* at 612. The defendant argued that "the prosecution had to produce independent evidence to corroborate the swap" of drugs for a gun described in the confession, but the Seventh Circuit rejected that argument as "overstat[ing] the requirement of corroboration." *Id.* at 614–15. It explained that corroboration is "met when the government presents evidence showing that the defendant's statement *as a whole* is trustworthy." *Id.* at 615 (emphasis added). Because the firearm had been recovered and several witnesses testified about defendant's drug use, "frequent house-to-house travel," and his "carr[ying] cash and a gun during these car trips," the evidence was sufficient to "allay any concern that [defendant] may have falsely confessed to involvement in the drug trade and swapped drugs for a gun." *Id.* Thus, the fact that there was no independent corroboration of the swap itself did not preclude conviction based on his confession because it was sufficiently corroborated "as a whole." See

also *United States v. Howard*, 179 F.3d 539, 543 (7th Cir. 1999) (finding that corroboration of other aspects of defendant's confession was sufficient to corroborate his pre-trial statements).[4]

The same is true here. Multiple aspects of Defendant's grand jury testimony were corroborated by the parties' stipulations and the evidence presented at the bench trial. For example, Defendant testified that the conspiracy's hierarchy was that Harris was the supplier, runners served as the middle-managers and distributors, and pack workers were responsible for selling to customers [Tr. Jan. 30, 2017, at 26–28]. Independent evidence corroborates that structure. Stipulation 14 states that Harris supplied drugs to Green, and Green then distributed drugs to Defendant and Richardson, who then sold drugs to customers. [630, ¶ 14.] Stipulation 16 shows Green reporting to Harris about police interactions, which confirms Harris's seniority to Green. Likewise, in one phone call, Defendant asks Green how much he supplied another pack worker and even refers directly to selling "cocaine." [Gov. 3 (Call No. 49431).] Calls also show Defendant reporting to Green on subjects such as the status of drug sales and police presence. See, *e.g.*, *id.* (Call No. 41722).

Other features of conspiracy described by Defendant were corroborated. Defendant testified that the conspiracy sold drugs between West Jackson Boulevard and South Kilbourn Avenue [Tr. Jan. 30, 2017, at 26]. Numerous stipulations involved drugs sold at this location [630, ¶¶ 5, 7, 14, 16] and the Government admitted into evidence plastic bags containing crack cocaine seized from this location [see Gov. Ex. 22-A, 27-A, 43-A, 44-A]. Defendant testified that each pack contained thirty crack cocaine rocks [Tr. Jan. 30, 2017, at 26], and the parties stipulated that Redmond was arrested with six large baggies, each containing thirty small plastic

---

[4] Defendant relies largely on the Tenth Circuit's decision in *United States v. Roberts*, 14 F.3d 502 (10th Cir. 1993), but *Roberts* did not discuss *Opper*'s independent corroboration requirement and does not hold that statements about drug quantity in a confession are an "essential fact" requiring corroboration separate and apart from the statement as a whole. Nor does Defendant attempt to square such a reading of *Roberts* with the analysis from cases from this circuit like *Brooks* and *Howard*.

bags with one crack cocaine rock each [630, ¶ 12]. Phone calls also refer to a "whole 30," confirming that thirty was the standard pack size. [Gov. Ex. 3 (Call No. 39727).] Defendant testified that pack workers typically charged $10 per crack cocaine rock [Tr. Jan. 30, 2017, at 26–27], and both controlled buys by law enforcement were for roughly that amount [630, ¶¶ 5 (five bags for $50), 7 (six bags for $50)]. Defendant testified that drugs were sold seven days a week and from 7:00 a.m. to 10:00 p.m. [Tr. Jan. 30, 2017, at 27], and the wiretap recorded phone calls on a Saturday, Sunday, Monday, Tuesday, and Thursday [Gov. Ex. 3] from as early as 8:30 a.m. and as late as 7:43 p.m. (*id.*). Defendant testified that Harris, Green, Redmond, Richardson, Edwards, and Herndon were members of the conspiracy [Tr. Jan. 30, 2017, at 26–28], and he stipulated to conduct involving all of them [see 630, ¶¶ 7, 9, 14, 16]. Finally Defendant testified that he helped plant a gun to get Redmond out of jail [Tr. Jan. 30, 2017, at 28–29], he stipulated to this same conduct [630, ¶ 9], and the gun was admitted into evidence [Gov. Ex. 29-A].

In sum, almost every feature of Defendant's grand jury testimony was corroborated. Tellingly, Defendant offers no reason to think that his testimony under oath before the grand jury—months after his arrest and while he was represented by counsel—is unreliable. See *United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988) (finding the corroboration requirement "easily met" in a case that "does not involve arrest, interrogation, and confession"). Therefore, the Court concludes that "substantial independent evidence" corroborates Defendant's grand jury testimony and is sufficient to "establish the trustworthiness of the statement." *Opper*, 348 U.S. at 92. In reliance on that corroborated statement, the Government's calculation method is sufficient to prove beyond a reasonable doubt that the conspiracy involved 280 grams or more of crack cocaine.

But even if the Government were required to corroborate the specific inputs of its calculation, Defendant's argument would still fail. Defendant concedes that "there is sufficient evidence" to show that each pack contained 3 grams of cocaine. [713, at 8.] That leaves only the number of workers selling at a time (five), the number of packs sold per worker per day (four), and the length of the conspiracy (roughly four years). Defendant contends there was no corroboration that five workers worked on any given day of the conspiracy. *Id.* at 8–9. Putting aside that Defendant testified only to the "average" number of daily workers [Tr. Jan. 30, 2017, at 27], independent evidence shows the presence of multiple workers at a given time. Stipulations 7 and 14 both refer to three workers [630, ¶ 7 (Defendant, Herndon, and another individual); ¶ 14 (Defendant, Green, and Richardson)]. In one phone call, Defendant refers to other workers as "them," suggesting more than at least two other people were selling besides him. [Gov. Ex. 3 (Call No. 39727).] Other calls reference at least one other worker, for a total of two workers at a time. *Id.* (Call Nos. 49431, 52424, & 55767). Whether the number is five, three, or two, independent evidence suggests that multiple workers were selling packs at a time.

Defendant also argues that the Government "has failed to establish workers distributed multiple packs per day." [713, at 9.] The evidence shows otherwise. In a phone call on April 29, 2014 at 8:28 a.m., Defendant told Green that he was "working on [his] fourth" [Gov. Ex. 3 (Call No. 55767)], which directly corroborates the Government's proposed estimate. Indeed, Defendant testified that he sold eight packs on average in 2014 [Tr. Jan. 30, 2017, at 27], and the fact that he had already sold more than three packs before 8:30 in the morning suggests he easily could have met that target. In another call at 2:51 p.m. a few weeks earlier, Green asked Defendant if he was on his "third one yet," and Defendant responded, "Yeah I got six left." [Gov. Ex. 3 (Call No. 41722).] In other words, Defendant had already sold the vast majority of

17

his third pack by the mid-afternoon, which would have put him on track to sell more than four packs that day. The fact that Defendant said that he was on his "second" pack in one call does not alter this conclusion. *Id.* (Call No. 52424). Defendant said in that same call that another worker was "almost done with his sh*t," suggesting that this worker had already sold more than two packs. *Id.* And separate from the wiretapped phone calls, Defendant testified that runners were typically given one more pack than the average given to pack workers [Tr. Jan. 30, 2017, at 28], and he stipulated that Redmond (a runner) was arrested with six packs [630, ¶ 12]. Together this evidence amply shows that workers sold multiple packs a day, and the Government's proposed estimate of four packs per day is both conservative and justified.

Defendant also argues that there is no evidence that the conspiracy lasted four years. [713, at 8.] Defendant emphasizes the wiretapped phone calls are from March 30 to April 29, 2014, and the stipulated conduct only covers April 9 through July 9, 2014. *Id.* Defendant overlooks the fact that testified that he was arrested in 2013 for selling crack cocaine [Tr. Jan. 30, 2017, at 35], which provides some support for the position that the conspiracy stretched back at least to 2013. But even if the Court were to accept Defendant's contention that the corroborating evidence supports a finding that only two workers sold two three-gram packs per day from March 30, 2014, to July 9, 2014 (or 101 days), that would still show that the conspiracy sold 1,212 grams of crack cocaine—more than four times the threshold amount. In sum, these facts prove Defendant guilty beyond a reasonable doubt of conspiracy to knowingly and intentionally possess with intent to distribute and distribution of 280 grams or more of a mixture and substance containing a detectable amount of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, Defendant is guilty of Count 1.

18

**III.     Conclusion**

For these reasons, the Court concludes that the Government's evidence is sufficient to sustain convictions on Counts 1, 22, 27, 29, 43, and 44 of the Indictment. This matter is set for status hearing on August 23, 2017, at 9:00 a.m.

Dated: July 26, 2017                                          _____
                                                                              Robert M. Dow, Jr.
                                                                              United States District Judge